National Publishing Company v. Commissioner
National Publishing Co. v. Commissioner
Docket No. 3492-63.
United States Tax Court
T.C. Memo 1965-271; 1965 Tax Ct. Memo LEXIS 59; 24 T.C.M. (CCH) 1470; T.C.M. (RIA) 65271; October 11, 1965
*59 1. Held, that the $749,177 which National Publishing Company received from the Redevelopment Authority of the City of Philadelphia in 1960 was received in payment of its real estate and buildings and the gain resulting therefrom was not taxable, National having stated in its 1960 income tax return that "National Publishing Company hereby elects non-recognition of gain under the involuntary conversion provisions of section 1033 of the internal revenue code." 2. The amount of depreciation allowable to National Publishing Company in 1960 on the new plant which it acquired after its old plant was taken by the Redevelopment Authority will be determined under Rule 50 in accordance with the facts which have been found with respect to that issue. Robert R. Batt, Sherwin T. McDowell, and D. V. Randall, for the petitioner. Albert J. O'Connor, for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined deficiencies in petitioner's income tax as follows: Year
Amount
1957
$89,626.73
1958
32,612.74
1960
34,075.00
The taxable years 1957 and 1958 are involved solely through the operation of net operating loss carrybacks from 1960. The issues in controversy involve the year 1960 only. The deficiency for 1960 was determined as follows: Taxable income as disclosed by return (Loss)
($245,678.80)
Unallowable deductions and additional income: (a) Machinery damages
$310,000.00
(b) Professional fees
9,036.50
(c) Depreciation
8,336.58
(d) Capital expenditures
1,056.20
328,429.28
Total
$ 82,750.48
Nontaxable income and additional deductions: (e) Machinery damage expenses
$ 5,884.70
(f) Contribution deduction
760.00
6,644.70
Corrected taxable income
$ 76,105.78
*61 Adjustment (a) is explained in the deficiency notice as follows: (a) Taxable income for the year 1960 is increased in the amount of $310,000.00, being a portion of a total award of $749,177.00 received from the Redevelopment Authority of the City of Philadelphia. Adjustment (b) is not in issue. Adjustment (c) is explained in the deficiency notice as follows: (c) The depreciation deduction allowable for the period May 16, 1960 to December 31, 1960 with respect to depreciable real estate having an adjusted basis as shown in Exhibit "A" attached and having a remaining useful life of 40 years, is computed as follows: Depreciation claimed on return $15,424.01 Depreciation allowed on new building: 2 1/2% of $453,595.53 X 15/24
of a year
7,087.43
Depreciation disallowed
$ 8,336.58
Adjustments (d), (e), and (f) are not in issue. The petitioner assigned error as to the determination of the Commissioner as follows: (a) The respondent erred in determining that $310,000 of alleged "machinery damages" constituted taxable income to the petitioner in the taxable year 1960. (b) The respondent erred in reducing by $8,336.58 the amount of depreciation allowable *62 as a deduction to the petitioner in the taxable year 1960. (c) The respondent erred in determining that the petitioner had a taxable income in the taxable year 1960 rather than a net operating loss, and in disallowing in its entirety the carryback of said net operating loss to the taxable years 1957 and 1958. Many of the facts were stipulated and the stipulation of facts, together with the exhibits attached thereto, is made a part hereof by this reference. There was also considerable oral testimony at the hearing. Findings of Fact Petitioner National Publishing Company, hereinafter referred to as National, is a Pennsylvania corporation which at all times material hereto was engaged in the business of printing and publishing in Philadelphia, Pa. National filed corporate income tax returns for the taxable years 1957, 1958, and 1960 with the district director of internal revenue at Philadelphia. Its corporate income tax returns for 1957, 1958, and 1960 are exhibits attached to the stipulation of facts which has been filed. National kept its books of account and filed its tax returns on the accrual basis of accounting and by calendar year. Prior to the events described hereinafter, *63 National's business operations were conducted on premises owned by it and situated at 239 South American Street, Philadelphia. National also used in its business an adjacent warehouse belonging to the partnership of Headley, Barlow & Co., hereinafter referred to as Headley-Barlow, and leased by it to National. The members of the partnership were also the principal stockholders of National. National and Headley-Barlow owned no real estate other than that referred to in this paragraph. On June 23, 1959, the Redevelopment Authority of the City of Philadelphia, hereinafter referred to as the Redevelopment Authority, a public body corporate and politic organized by the City of Philadelphia pursuant to the Pennsylvania Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, 35 P.S. § 1701, et seq., commenced condemnation proceedings in respect of the premises at 239 South American Street and the adjacent warehouse property, resulting in the taking of all of the land and the buildings thereon situated. In September 1958, prior to the commencement of formal condemnation proceedings, National received notification from Benjamin Strauss to the effect that Strauss had been appointed by *64 the Redevelopment Authority as the latter's agent to negotiate the condemnation. National thereupon retained John Herd, an executive of a real estate firm, to represent it in the negotiations. Early in December 1958, Herd, having had numerous conferences with Strauss, reported to National that he had gone as far as he could in the negotiations. Herd reported to the president of National that he had been informed during the negotiations with Strauss that under the rules and regulations applicable to this condemnation, the Redevelopment Authority could compensate only for the fair market value of the realty taken and could not compensate for the replacement of facilities, for the cost of business interruption, or for moving costs. Herd reported further that the only firm offer he had received from Strauss for the realty of National and Headley-Barlow was $410,000 and that in his judgment it might be possible to get as much as $500,000, but no more, through additional negotiations. In March 1959, National's management, having in the meanwhile inspected and prices some 50 plants in the Philadelphia area and made related cost projections, reported to its board of directors that the *65 total cost of relocating National's plant (including therein the cost of acquiring a new plant and adapting it to National's needs) would be in excess of $1,250,000. As a result of this estimate, National's board of directors was convinced that it would be impossible for National to continue in business if it received an award of only $500,000. Accordingly, Herd was told not to attempt further negotiations and National's president was instructed to secure counsel with the intent of forcing the Redevelopment Authority into formal condemnation proceedings. Accordingly, in April 1959, C. Howard Thomas, National's president and chief executive officer, retained R. Sturgiss Ingersoll, a member of the Philedalphia bar, for the purpose of representing National and Headley-Barlow in the condemnation proceedings. Thomas advised Ingersoll of the prior negotiations and stated that unless an award of substantially more than $500,000 was received, National would have to close up shop and go out of business. Upon the commencement of formal condemnation proceedings, Ingersoll entered his appearance on behalf of the condemnees and immediately opened negotiations with the Redevelopment Authority. *66 These negotiations resulted in no progress. In late June 1959, the condemnees received notice to vacate the condemned premises no later than December 31. Accordingly, Ingersoll arranged a meeting which was held in mid-July and was attended by Ingersoll and Thomas and by Benjamin M. Haller, director of the Redevelopment Authority's real estate division. Haller, while expressing sympathy and concern for National's plight, confirmed that under the governing law and rules and regulations the Redevelopment Authority could compensate only for the fair market value of realty taken and that it could not compensate for moving costs in excess of $2,500, and that it could not compensate at all for the replacement of facilities or for the cost of business interruption. In response to proposals advanced by Thomas, Haller stated that National could not remain at its present site on any basis, nor could the Redevelopment Authority secure equivalent plant facilities for National and physically move National into those facilities. Thereafter, and at the same meeting, Haller solicited a settlement offer. After conferring with Thomas, Ingersoll stated that on the condition of National being given *67 time to find a new location and move its equipment and machinery, Thomas would recommend to National's board acceptance of $750,000 as total settlement for the realty. This offer, which covered both properties, was on a lump-sum basis. The Redevelopment Authority, however, continued to be adamant along the lines of approximately $500,000 and neither accepted Thomas' offer nor made any counteroffer. At no time during the negotiations did the Redevelopment Authority ask for any statement of National's actual or anticipated expenses of removal, nor was any such statement furnshed to the Authority or any claim for reimbursement of moving expenses advanced by National against the Authority. Early in 1960, Thomas advised his attorney, Ingersoll, that matters were very acute and that he was in distress because he felt that he could not possibly carry on National's business unless he received at least $750,000. At Ingersoll's suggestion an appointment was arranged with Richardson Dilworth, the Mayor of Philadelphia. As Mayor, Dilworth had appointed the members of the Redevelopment Authority, and a member of Dilworth's Cabinet, William L. Rafsky, served both as development coordinator for *68 the city and as director of the Redevelopment Authority. Ingersoll and Thomas met with Mayor Dilworth on February 1, 1960. Ingersoll told the Mayor that there was something of an employment crisis in Philadelphia and that the Mayor's redevelopment program would receive a black eye if initially there was the destruction of a profitable going concern like National with a large number of employees receiving good wages. Without going into further detail, Ingersoll stated that the Redevelopment Authority had offered $500,000, whereas National required $750,000 in order to stay in business. The Mayor listened to the statements made to him and stated he would investigate, see what could be done, and get in touch with Ingersoll promptly. Mayor Dilworth, mindful of the fact that the loss of National, a profitable enterprise, with its 500 employees would be a serious blow to the city and to its industrial development and redevelopment programs just as these programs were getting under way, proceeded to discuss the matter with Rafsky and with the then chairman of the Redevelopment Authority. All came to the conclusion that it was essential to keep National in business and it seemed to them *69 that $750,000 was not out of line and was a fair and reasonable evaluation. Accordingly, on February 2, 1960, Mayor Dilworth telephoned Ingersoll and informed him that "we had re-reviewed the situation and in our opinion $750,000 was a fair figure and we would see that the company got the $750,000 instead of $500,000." Mayor Dilworth had no further connection with the matter other than to follow up to see that the money was paid. On the morning of February 2, 1960, after his telephone conversation with the Mayor, Ingersoll telephoned Thomas and told him that he (Ingersoll) had good news, that he had received confirmation from the Mayor that National would definitely receive $750,000 for the taking of its plant. Ingersoll told Thomas that he had confidence in the Mayor and that he felt that Thomas could consider it a closed book. There were no subsequent negotiations with the Redevelopment Authority. Ingersoll regarded the matter as closed except for the processing of the $750,000 payment by the Redevelopment Authority. His only subsequent contact with the Authority until late July was to follow up occasionally by telephone. On those occasions he was advised that the matter was *70 being processed and that he should "hold steady * * * Sit tight." Under date of July 26, 1960, Francis J. Lammer, executive director of the Redevelopment Authority, transmitted to Ingersoll a document entitled "Offer of Sale of Land" with the request that Ingersoll have it executed and return it to the Authority at his earliest convenience. Lammer stated that as soon as the Redevelopment Authority was in receipt of the necessary Urban Renewal Agency approvals, the Authority would be pleased to schedule settlement. This offer of sale of land prepared by the Redevelopment Authority took the form of an offer by National and Headley-Barlow to sell and convey to the Redevelopment Authority the premises at 239 South American Street and the adjacent warehouse for a total purchase price stated as "$439,177 flat, plus $310,000 machinery (subject to approval of our Urban Renewal Agency)." In the document the Redevelopment Authority was given the right, notwithstanding prior acceptance of the offer, to proceed to acquire the premises by condemnation. The sellers agreed to such condemnation upon the payment of just compensation "which shall be the purchase price above stated, which price the *71 seller hereby declares to be the fair market value of said premises, inclusive of every interest therein." Ingersoll, regarding the offer of sale of land as, in substance, a confirmation of Mayor Dilworth's undertaking, advised Thomas to execute it. Such execution was effected on July 27, 1960, and Ingersoll returned the executed document to the Redevelopment Authority. At some subsequent date the Authority's acceptance, back dated to July 9, 1960, was indicated thereon. On November 2, 1960, final settlement was had between the condemnees and the Redevelopment Authority. At the settlement petitioner's attorney, acting on behalf of both the condemnees, received the amount of $339,178.75, representing the amount of the agreed payment (plus $1.75 to cover acknowledgment of the deed), after allowing credit for $410,000 paid by the Redevelopment Authority on account on April 19, 1960. In return, petitioner's attorney delivered to the Redevelopment Authority a deed of confirmation of the condemned premises and a document captioned "Release, Waiver and Acknowledgment." By agreement between National and Headley-Barlow the total payment from the Redevelopment Authority, viz, $749,177, *72 was divided $613,535 to National and $135,642 to Headley-Barlow. The deed of confirmation which ran from National and Headley-Barlow, as grantors, to the Redevelopment Authority, as grantee, recited the divestiture of the grantors' title by reason of the condemnation proceedings and stated the consideration as follows: "ONE DOLLAR ($439,177.00) having been paid as damages for the appropriation of said premises." The "Release, Waiver and Acknowledgment" executed by National and Headley-Barlow and describing them as "(tenants) or (lessees)" took the form of an agreement on their part to vacate the condemned premises without notice upon receipt of the sum of $310,000" in full settlement of any and all claims for damages resulting from condemnation or removal of machinery, fixtures and equipment, of any and all kinds, located within said premises, and in full settlement of any and all damages resulting from termination of leasehold, that (We, I) may have against the Redevelopment Authority of the City of Philadelphia or any or all interested parties." The document concluded with a general release of "the owners and/or the Redevelopment Authority" from all claims. The settlement sheet *73 which was signed on behalf of National and the Redevelopment Authority showed a "balance due seller" of $339,178.75, arrived at by adding to a "consideration" of $439,177, an item captioned "machinery" of $310,000 and an item captioned "acknowledgment of deed" of $1.75, making a total of $749,178.75 and subtracting therefrom $419,000 paid on account. The "Offer of Sale of Land" and the other closing documents described above were prepared by the Redevelopment Authority without consultation with petitioner's attorney Ingersoll who was representing petitioner in the transaction. The breakdown of the figures as shown in these documents was determined by the Authority. Ingersoll did not ask for any explanation as to why the documents were drawn in the way in which they were drawn because his client was receiving approximately the $750,000 which had been agreed upon. In February 1960, faced with a March 31 postponed deadline for vacating the condemned premises and cognizant of the fact that the acquisition of a new plant would require the reinvestment of the entire proceeds from the condemnation, National and Headley-Barlow agreed between themselves that Headley-Barlow's share of the *74 proceeds should be approximately $125,000 net, and estimated that Headley-Barlow's share of the costs would come to approximately $10,000. In the actual division of the proceeds by the condemnees after final settlement the gross amount allocated to Headley-Barlow was $135,642 and the balance, $613,535, was allocated to National. Costs totaling $10,642 were charged to Headley-Barlow. On May 16, 1960, prior to the completion of the condemnation proceedings, National and Headley-Barlow completed settlement on the purchase of premises situated at 24th and Locust Streets, Philadelphia, taking title to undivided fractional interests as tenants in common. National took a six-sevenths interest and Headley-Barlow a one-seventh interest. HeadleyBarlow thereupon leased its one-seventh interest to National. The purchase price of the premises at 24th and Locust Streets was $750,000, in addition to which National and Headley-Barlow were required to pay settlement costs of a capital nature totaling $2,413. Of the gross cost of the property, viz, $752,413, National contributed $627,413 and Headley-Barlow contributed the balance, $125,000. National made improvements to the buildings on the premises *75 at its own expense. In the condemnation proceedings the Redevelopment Authority did not acquire any right, title or interest in or to any of the machinery equipment or inventory of National. On April 1, 1960, National commenced a phased removal of said machinery, equipment and inventory from the condemned premises to the premises at 24th and Locut Streets. The move was completed and the plant at 24th and Locust Streets was in full production on May 31, 1960. The only formal action taken by National's board of directors with respect to the condemnation was the adoption of the following resolution at its next annual meeting following the termination of the condemnation proceedings: RESOLVED, That the settlement with the Philadelphia Redevelopment Authority for the taking of premises 239-247 S. American Street, and 243 S. Second Street (which included 255-257 S. Third St., being the property of Headley-Barlow & Co.) for the sum of Seven Hundred Forty-Nine Thousand One Hundred Seventy-Eight Dollars and Seventy-Five Cents ($749,178.75) be and the same is hereby approved and ratified, and the actions of the Officers with respect hereto be and the same are hereby approved and ratified. *76 * * * By appropriate journal entries, National relieved its books of the asset and depreciation reserve accounts applicable to the premises at 239 South American Street, crediting the amount by which its share of the condemnation proceeds ($613,536.75) exceeded the net book value of the said premises ($198,145.85) to "Surplus from Involuntary Conversion." Such excess so credited amounted to $415,390.90. In connection with the relocation of its business and the moving of its machinery and equipment, National made the following expenditures which were debited to expenses or cost of goods sold in National's books of account, and which were included in cost of goods sold or deducted in National's income tax return for the taxable year 1960: Building Repairs and Maintenance
$ 43,160.56
Composition
7.40
Electrotyping
32.08
Factory Expense
14,059.58
Maintenance of Machinery
42,151.03
Warehouse Charges
5,416.64
Paper
136.84
Subcontract Manufacturing
1,301.50
Packing Boxes and Supplies
136.98
Advertising - Bible Division
21.30
Office Expense
3,463.03
Professional Services
2,775.00
Stationery
1,094.68
Moving Expense
77,322.35
Labor
52,597.12
$243,676.09
*77 National made other expenditures totaling $95,475.59 which it initially charged to moving expenses but later capitalized. The net book value of National's machinery and equipment at May 16, 1960, and December 31, 1960, was $381,681.44 and $455,025.66, respectively. National attached a rider to its Federal income tax return for the calendar year 1960 which reads as follows: On November 2, 1960 the Redevelopment Authority of the City of Philadelphia made final settlement of a condemnation award to the National Publishing Company for the acquisition of the company's land and building located at 239 South American Street, Phila. Pa. On May 16, 1960 the National Publishing Company replaced the condemned property by the purchase of land and buildings at 24th and Locust Streets, Phila, Pa.
National Publishing Company hereby elects non-recognition of gain under the involuntary conversion provisions of section 1033 of the internal revenue code. The following summarizes the above transactions: Condemnation of 239 South American Street
Total Consideration Received from Redevelopment Authority
$613,536.75
Less: Adjusted basis of property
198,145.85
Total Gain on Involuntary Conversion
$415,390.90
Total Consideration Received
$613,536.75
Less: Purchase price of Replacement Property
627,413.00
Excess of Replacement Cost over Consideration Received
$ 13,876.25
Basis of 24th and Locust Streets Property
Purchase Price of Replacement Property
$627,413.00
Less: Unrecognized Gain
415,390.90
Basis of 24th & Locust Streets Property
$212,022.10
*78 The Redevelopment Authority secures funds from the Housing and Home Finance Agency, an agency of the Federal Government which administers funds appropriated under the National Housing Act. Under the National Housing Act at the time of the instant condemnation there was a discretionary power to pay moving expenses for personal property up to $3,000. No such payment was granted or was made in this case. On July 10, 1962, Francis J. Lammer, executive director of the Redevelopment Authority, wrote a letter to Robert R. Batt, attorney for National, which reads as follows: Re: National Publishing Company Dear Mr. Batt: This will acknowledge receipt of your letter dated April 4, 1962. We regret the delay in the reply, by reason of the fact that our staff has been fully committed in many time-consuming areas. The question that you raise is whether "any part of this award was intended… as compensation… in moving…." On July 17, 1959, the Authority received a letter from you, which contained, inter alia: "Mr. Thomas has authorized me to state to you that under circumstances of his company being allowed to remove such machinery and equipment as it might desire and under circumstances *79 of your naming an eviction date far enough in advance to enable Mr. Thomas to make the move, he would recommend to his Board of Directors an acceptance of $750,000.00 in full settlement of the matter." A review of our files indicates that an Offer of Sale of Land, on a form prepared and furnished by the Authority, dated July 27, 1960, was executed on the following basis: $439,177.00 for land and improvements; and $310,000.00 for machinery; (subject to certain approvals). This breakdown was determined by the Authority. On October 19, 1960, the U.S. Housing and Home Finance Agency advised us, in writing, that $749,177.00 met with their approval, "which includes real estate, as well as machinery and equipment damages." On November 2, 1960, the transaction was consummated at the offices of the Commonwealth Land Title Insurance Company, by formal Deed recorded in Deed Book No. 1494, page 436. A copy of the settlement figures indicates a breakdown, by the Authority, of $439,177.00 as "consideration", and $310,000.00 as "machinery" resulting in the total approved by the U.S. Housing and Home Finance Agency. You understand, of course, that damages may arise with respect to machinery *80 and equipment, notwithstanding the fact that the Authority may have had no intention of acquiring title, use or possession of said machinery and equipment, as in this case. Nothing in our files would indicate how the machinery and equipment was disposed of by National Publishing Company. Under State legislation, there is no legal obligation to pay moving expenses for personal property in any event. Under applicable Federal legislation, at the time of this transaction, there was a discretionary power to pay moving expenses for personal property up to $3,000.00. No such payment was made in this case. Further facts relevant solely to the depreciation issues involved in this proceeding are as follows: The total land area of the premises at 24th and Locust Streets is 67,011 square feet. The property is bounded on the east by 24th Street, on the north by Locust Street, and on the west by 25th Street. On the south side a small dogleg has a 46-foot frontage on Manning Street. The larger portion of the building on the property, a U-shaped structure abutting on 24th and 25th Streets and on Locust Street, was built principally between 1911 and 1913. This structure is built of reinforced *81 concrete and is of six stories, with the exception of a partial two-story addition added in 1927. An attached one-story structure, a former brick stable building, was built about 1880. The total floor area of the building is 204,722 square feet. As of May 16, 1960, the date of acquisition, the building had an electrical system with a knife-type switch and copper bus bars going basically back to 1913. The concrete used in the building was not of the type which is used today. The window sash, in part metal and in part wood, was almost completely disintegrated. The plumbing was extensively corroded. The sprinkler system, which went back to 1913, was obsolete and nonfunctioning. One of the elevators had electrical controls and motor that went back to 1913 and another, the passenger elevator, was secondhand when installed in 1952. The building had a dust collector system which was corroded. The concrete floors had disintegrated and required new, expensive replacement and sealing. The portion of the premises at 24th and Locust Streets not built on is used for parking purposes. The parking space was very convenient for the use of petitioner's employees and was used by them for that purpose. *82 The premises at 24th and Locust Streets are zoned industrial; east of 24th Street and north of Walnut Street, the zoning is commercial and residential. There has been no new industrial construction in the area during the past 10 or 15 years. Of the more than 100 new buildings built within a radius of several blocks, all have been residential. The building on the premises at 24th and Locust Streets was serviceable in 1960 and was not obsolete. The value on May 16, 1960, of the depreciable assets on the premises at 24th and Locust Streets was $600,000. The value of the entire property on that date was $750,000. The said depreciable assets had a remaining useful life on May 16, 1960, of 21 years. The parties have stipulated the following facts which we include for the purpose of a clear understanding of the matters dealt with in that part of the stipulation: 16. Of the $627,413 contributed by National to the gross cost of the premises at 24th and Locust Streets, as aforesaid, National allocated $582,713 to the undivided interest acquired by it in the building thereon and $44,700 to the undivided interest acquired by it in the land. 16(a) The statutory notice of deficiency *83 determined the gross basis of National's undivided interest in the property, including building improvements made by National and other expenditures chargeable to capital account, to be $666,330.92 and made the following allocation thereof: Before Re-
After Re-
duction For
duction For
Non-Recog-
Non-Recog-
nized Gain
nized Gain
Land
$132,565.00
$112,654.00
Building
533,765.92
453,595.53
Total
$666,330.92
$566,249.53
17. The last four items, having a total reported unadjusted basis of $360,345.15, listed in the depreciation schedule attached to National's 1960 Federal Income Tax Return * * * correspond to the building and building improvements on the premises at 239 South American Street. The item in said schedule captioned "Building - 24th and Locust" in the amount of $13,876.25 represented the excess of National's contribution to the gross cost of the premises at 24th and Locust Streets over National's share of the payment received from the Redevelopment Authority, as computed in the schedule immediately preceding said depreciation schedule. The item in said depreciation schedule captioned "Building Improvement - 1960" in the amount of *84 $26,155.66 represented the cost of certain improvements to the building at 24th and Locust Streets made by National during the taxable year 1960. 17(a) In his statutory notice of deficiency, Respondent determined the basis for depreciation for National's undivided interest in the building at 24th and Locust Streets to be $453,595.53, as set forth in paragraph 16 hereof. 17(b) Neither National, in its 1960 income tax return, nor Respondent, in his notice of deficiency, made any adjustments to or reduction in the depreciation basis of National's machinery and equipment by reason of the payment received from the Redevelopment Authority. * * *
20. With respect to the assignment of error set forth in paragraph 4(b) of the petition, it is hereby stipulated as follows: A. National made improvements to the building at 24th and Locust Streets at a cost of $27,211.86. Of this total, $13,957.00 was billed to National and posted to its books of account prior to May 31, 1960. The balance of $13,254.86 was billed and posted after May 31, 1960. These improvements had a useful life of the same duration as the building. The statutory notice allowed this amount as an increase in basis under *85 the headings of "Capitalized Per Journal Entry - $26,155.66" and "8/22/60 Sherman Engineering Co. - $1,056.20" * * * Opinion BLACK, Judge: We shall take up and decide the issues in their order. Issue 1 Petitioner states this issue in its brief as follows: The principal issue for adjudication is the proper tax treatment to be accorded to amounts received by Petitioner in 1960 from the Philadelphia Redevelopment Authority in connection with the condemnation of Petitioner's real estate by the Authority. Respondent has proposed to include a portion thereof, viz., $310,000, in Petitioner's taxable ordinary income. Petitioner, on the other hand, contends that the entire proceeds of condemnation, including the $310,000 at issue, constituted payment by the Redevelopment Authority to Petitioner for the condemned real estate and that since the resulting gain was not recognizable by reason of an election made by Petitioner pursuant to Section 1033 of the Internal Revenue Code, [of 1954] no part of the condemnation proceeds constituted taxable income to Petitioner. As we have already stated, the Commissioner has determined in his deficiency notice that "Taxable *86 income for the year 1960 is increased in the amount of $310,000.00, being a portion of a total award of $749,177.00 received from the Redevelopment Authority of the City of Philadelphia." The substance of the Commissioner's contention, as we understand it, is that the $310,000 in question was not a part of the compensation for petitioner's real estate taken by the Redevelopment Authority but that it was paid to petitioner as moving expenses and was taxable as ordinary income. Point 1 relied upon by respondent is stated in his brief as follows: An ascertainable portion of the total payment is severable and allocable to machinery. The amount so allocable should be treated as a reimbursement for moving expenses; thus includible in gross income. Alternatively, the actual cost of moving is a capital expenditure. There can be no doubt but that petitioner had a gain on the involuntary conversion of its property located at 239 South American Street, Philadelphia. A rider attached to petitioner's income tax return for 1960, which rider we have included in our Findings of Fact, shows "Total Gain on Involuntary Conversion $415,390.90." This rider also includes the following language: *87 National Publishing Company hereby elects nonrecognition of gain under the involuntary conversion provisions of section 1033 of the internal revenue code. The pertinent provisions of section 1033 of the 1954 Code are printed in the margin. [1]
*88 We have endeavored to make full and complete findings of fact on this issue. These findings of fact are made from the facts which have been stipulated by the parties and from the oral testimony. It seems to us to have been clearly established that petitioner was to receive $750,000 for its property located at 239 South American Street, Philadelphia, exclusive of its machinery, and that, to use the language of Mayor Dilworth "that figure represented a fair and just evaluation of such property." We can find no support in the record for the Commissioner's determination that petitioner received $310,000 taxable ordinary income from the transaction. The Commissioner, as we have said, seems to take the view that the $310,000 was received for moving expenses. But we do not think the record supports that view. We think that it clearly shows that it was not so received. In our Findings of Fact we have a finding of fact that Benjamin Haller was director of the Redevelopment Authority's real estate division and that in an interview with petitioner's president, Thomas, and petitioner's attorney, Ingersoll, Haller expressed the view that under the governing law and regulations the Redevelopment *89 Authority could compensate only for the fair market value of realty taken and that it could not compensate for moving costs in excess of $2,500, or for the replacement of facilities or for the cost of business interruption. So, regardless of some terms used by the Redevelopment Authority in the "Offer of Sale of Land" and in the deed signed by petitioner conveying the land to the Redevelopment Authority, which instruments were prepared by the Redevelopment Authority, the money which was paid to petitioner was paid for the land and buildings taken in the condemnation proceedings. In the closing documents the $310,000 appears as a separate item. We think, however, that a careful examination of the entire record demonstrates that this $310,000 was not in fact intended by the Redevelopment Authority to represent any thing other than additional compensable value inuring in the condemned land and buildings. It would appear, therefore, that the Redevelopment Authority, having determined $310,000 to be the measure of the increment of value of the condemned real estate attributable to the presence of the machinery therein, was required by its rules and regulations to show this figure as a *90 separate item. While this was of no concern to National and was never explained to its representatives, the significant point for present purposes is that the entire amount of the condemnation proceeds, including the $310,000 in question, was intended as payment by the Redevelopment Authority for the land and buildings taken. In the case of Arch B. Johnston, 42 T.C. 880 (1964), we said: "That tax issues are to be decided upon the basis of substance rather than form is so fundamental as to require no citation of authority." When we consider the substance of what was done here and the surrounding circumstances which attended to what was done, it seems clear to us that the entire amount which National received from the Redevelopment Authority was received for its real estate taken by the Authority in the condemnation proceedings and should be so treated. Respondent's own requested finding of fact No. 8 reads as follows: Petitioner knew as early as 1959 that it could live with a total payment of $750,000. This was the amount which, combined with the amount it could borrow safely, would enable it in its judgment to relocate within the City of Philadelphia. Its judgment *91 in this matter was based upon estimates made by it of the cost relocation as early as March 1959. It knew on the other hand that a total payment of $500,000 would make it impossible to finance the cost of relocating the business. The above statement in a brief way correctly tells the story in our judgment. It represents the substance of the transactions upon which we have based our decision on this Issue 1, which is the main issue in the case. On Issue 1 we hold for the petitioner. Issue 2 Petitioner's second assignment of error was: (b) The respondent erred in reducing by $8,336.58 the amount of depreciation allowable as a deduction to the petitioner in the taxable year 1960. It has been stipulated that "National is not entitled to any depreciation for the year 1960 with respect to the premises at 239 South American Street." It is depreciation on the new property which petitioner acquired at 24th and Locust Streets which is in issue in this proceeding. As has already been stated, the new property acquired by petitioner was acquired for $750,000. Petitioner contends that of the total purchase price paid by it, $695,000 is allocable to the building thereon which would leave *92 $55,000 allocable to the land. Section 1.167(a)-5, Income Tax Regs. reads as follows: Sec. 1.167(a)-5 Apportionment of Basis. In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * * * In our Findings of Fact we have found that on May 16, 1960, the value of the depreciable assets at 24th and Locust Streets was $600,000. The value of the entire property was $750,000; the land had a value of $150,000. Therefore, the basis for the depreciable property was $600,000 instead of the $695,000 claimed by petitioner. It has been stipulated by the parties that - A. National made improvements to the building at 24th and Locust Streets at a cost of $27,211.86. Of this total, $13,957.00 was billed to National and posted to its books of account prior to May 31, 1960. The balance of $13,254.86 was billed and posted after May 31, 1960. These *93 improvements had a useful life of the same duration as the building. The statutory notice allowed this amount as an increase in basis under the headings of "Capitalized Per Journal Entry - $26,155.66" and "8/22/60 Sherman Engineering Co. - $1,056.20" * * * Also we have found in our Findings of Fact "The said depreciable assets had a remaining useful life on May 16, 1960, of 21 years." In a computation under Rule 50 the depreciation deduction to which petitioner is entitled on the buildings and improvements at 24th and Locust Streets should be computed in accordance with the above stated finding of fact. Decision will be entered under Rule 50. Footnotes
1. SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule. - If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted - (1) Conversion Into Similar Property. - Into property similar or related in service or use to the property so converted, no gain shall be recognized. * * *
(3) Conversion Into Money Where Disposition Occurred After 1950. - Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of Gain. - If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * *
(c) Basis of Property Acquired Through Involuntary Conversion. - * * * In the case of property purchased by the taxpayer in a transaction described in subsection (a)(3) which resulted in the nonrecognition of any part of the gain realized as the result of a compulsory or involuntary conversion, the basis shall be the cost of such property decreased in the amount of the gain not so recognized; and if the property purchased consists of more than one piece of property, the basis determined under this sentence shall be allocated to the purchased properties in proportion to their respective costs.↩